In the Matter of the Accounting of FRANCIS R. APPLETON, JR., as Trustee, and CHASE NATIONAL BANK OF THE CITY OF NEW YORK et al., as Executors of CHARLES L. LAWRANCE, Deceased Trustee, under the Will of FRANCES A. LAWRANCE, Deceased.

Surrogate's Court, New York County, September 26, 1952.

*Allen T. Klots* and *Merrell E. Clark, Jr.,* for trustee and executors, petitioners.

*Edward J. Gould,* special guardian for William G. Lawrance, an incompetent, and others, respondents.

FRANKENTHALER, S. The surviving trustee and the executors of the deceased trustee seek a judicial settlement of the fiduciaries' accounts for the period beginning July 16, 1926, and ending December 31, 1950. The special guardian of an incompetent and several infant beneficiaries objects to the acts and transactions of the trustees only insofar as they relate to railroad bonds which lost their eligibility as trust investments during the years of the depression and were not sold by the trustees for several years thereafter. All of these securities were legal for investment of trust funds when purchased and no complaint is made respecting the original investment. The special guardian contends, however, that as each security was removed from the legal list, the trustees were obliged to dispose of it with reasonable promptness and that failure to dispose of such security within a year constituted a breach of trust. He demands that the trustees be surcharged with the difference between the highest market value of each bond during the year following its removal from the legal list and the price at which the bond was subsequently sold.

The objections of the special guardian deal with six different issues of railroad bonds. All but one were removed from the legal list between 1929 and 1935. They were sold at a loss during the years 1942 and 1943. The other group of bonds became ineligible in 1938 (after the enactment of Personal Property Law, § 21, subd. 6) and was sold in 1941. The petitioners offered proof tending to show constant attention to the bonds, collection of data respecting them, consultation with persons expert in the field regarding time of sale and continued efforts to determine ultimate sale in a manner to benefit the trust estate. The special guardian contends that the trustees were under an absolute duty to dispose of any bond after it became ineligible for trust funds, that the rule of due care and prudence is not at all applicable here, and that retention for even a single year was wrongful.

He contends that subdivision 6 of section 21 of the Personal Property Law (L. 1938, ch. 356, eff. April 1, 1938) is not applicable, except to one transaction, because the trustees had committed a breach of duty and had incurred liability to the beneficiaries prior to the enactment of that statute.

The problem that confronted these trustees in 1930 was not peculiar to this trust estate but was one that troubled investors as well as public officers and legislators. The history of subdivision 6 of section 21 of the Personal Property Law and of related statutes is significant here, not so much as a basis for interpreting the statutes but more especially as a background against which the trustees' actions and decisions are to be viewed if they are to be judged in the light of then existing conditions.

Economic and business conditions had so affected the railroads in the early nineteen thirties that many of them were no longer able to satisfy the statutory requirements for eligibility of their obligations as investments for savings banks and for fiduciaries. Many actually lost their eligibility and many more were in immediate danger of doing so. The removal from the legal list of this State of billions of dollars of such securities would, among other things, further depress the price of the securities and result in large losses to banks and trust estates. Beginning in 1932, the Legislature attempted to meet the situation by permitting investment in certain railroad bonds for a limited time notwithstanding that they did not measure up to all of the requirements of the Banking Law. (L. 1932, ch. 5.) The continued use of this temporary expedient ultimately evoked opposition. (See Bulletin, Committee on State Legislation, Association of Bar of City of New York, 1937, No. 167.) The final moratorium statute was enacted in 1937 and expired on April 1, 1938. (L. 1937, ch. 145.)

In his report to the Legislature for the year 1937, the Superintendent of Banks said (N. Y. Legis. Doc., 1938, No. 24, p. 13): "The problem of railroad obligations continues to be one of the most serious confronting institutional investors. For many years, the State of New York has recognized a large number of railroad securities as eligible investments for savings and trust funds. Yet in December, 1932, of the seven billion dollars of railroad securities on the legal list, five billion would have been ineligible for investment had it not been for the so-called moratorium which waived certain requirements relating to the ratio of earnings to fixed charges. This moratorium has been renewed

annually in the hope that each succeeding year would result in conditions more favorable to the railroads. It appears, however, that we have been waiting for improved business conditions to restore to the railroads a financial stability which can only be accomplished by a combination of more profitable business and the solution of problems which are fundamental to the entire industry. The progress which has been made since 1932 has not been encouraging. On the contrary, our experience indicates that the entire problem of rail securities as investments for savings banks should be reconsidered and that the existing moratorium should be modified to prohibit new investments in a large group of this class of obligations.''

The 1938 amendments to the Banking Law made substantial changes in relation to the powers of investment of savings banks (L. 1938, ch. 352; see N. Y. Legis. Doc., 1939, No. 24, p. 10). Trustees were affected by these changes because by statute they were authorized to invest trust funds '' in the same kind of securities as those in which savings banks of this state are by law authorized to invest the money deposited therein ''. (Personal Property Law, § 21, subd. 1.) As a result of the new legislation and the failure to continue the moratorium, railroad obligations exceeding three billion dollars, par value, were removed from the legal list on July 1, 1938. (N. Y. Legis. Doc., 1939, No. 24, p. 11.)

The 1938 revision of the article of the Banking Law relating to savings banks inserted in section 235 a new subdivision 7-b which read: '' Any savings bank which prior to April first, nineteen hundred thirty-eight acquired any railroad obligation eligible at the time of acquisition for investment by savings banks may continue to hold such obligations as though the same continue to be eligible by law for new investment by such savings bank.'' (L. 1938, ch. 352.)

At the same time the Legislature amended the statutes relating to investment powers of trustees and other fiduciaries. (L. 1938, ch. 356.) A new subdivision 6 added to section 21 of the Personal Property Law, provided: '' No trustee or other person holding trust funds for investment shall be liable for any loss incurred with respect to any investment not eligible by law for the investment of trust funds if such ineligible investment was received by such fiduciary pursuant to the terms of the instrument creating the fiduciary relationship or if such ineligible investment was eligible when received, or when the investment was made by the fiduciary; provided such fiduciary

exercises due care and prudence in the disposition or retention of any such ineligible investment." An identical provision was also added to section 111 of the Decedent Estate Law, regulating investment of funds by other fiduciaries.

These new provisions added to the Banking Law, the Personal Property Law and the Decedent Estate Law, were patently all part of the same legislative plan for salvaging investments in railroad securities. The provision added to the Banking Law is by its express terms restricted both as to time and as to subject matter. The text added to the Personal Property Law is more general in scope and unlimited as to time. The source of this statute seems to be the Pennsylvania Fiduciaries Act, which is in almost identical language. (20 Purdon's Penn. Statutes [Perm. ed.], p. 780, § 817; Fiduciaries Act of 1917, § 41 (a), subd. 1, par. 17c); see, Hutto, "New Laws Affecting Banks ", N. Y. State Bar Bulletin, Vol. 10, No. 3, 92, 94.)

It was during this critical period that the trustees made their decisions to retain the bonds for a more favorable price. They were not alone in their belief that an immediate sale would not realize the true value of the bonds and that the railroads would recover within a short period of time. Public officials, legislators and bankers shared the same beliefs. These trustees can hardly be said to have committed a breach of trust unless their duty to dispose of the bonds was absolute and their discretion as to time was very severely circumscribed.

Certainly the retention of the bonds after April 1, 1938, was subject to the rule of vigilance and prudence. Although the statute may have been directed primarily and immediately to the bonds that would fall from the legal list on termination of the moratorium (N. Y. State Bar Bulletin, *supra*), the text of subdivision 6 is broad enough to cover bonds that had never been rescued by any of the moratorium provisions and were properly held by them at that time. Indeed the subdivision has been given a very liberal interpretation (*Matter of Westerfield,* 278 App. Div. 153, affd. 303 N. Y. 916; *Matter of Flagg,* 275 App. Div. 848), but whether viewed liberally or narrowly it clearly furnishes the rule for retention of railroad bonds after April 1, 1938. The test thereafter is whether they exercised " due care and prudence in the disposition or retention of * * * such ineligible investment." The proof in this record shows that they did exercise due care and prudence.

Prior to the enactment of subdivision 6, the rule governing retention and disposition of ineligible investments was different

in its expression although under some circumstances the difference in operation of the two rules would be imperceptible. After 1938, the removal of a security from the legal list does not alone and of itself give rise to a duty to sell the security. Other factors determine whether, in the exercise of due care and prudence, the security is to be sold or retained. Prior to that time trustees were under a duty to sell a security which had become ineligible, but the duty was not to sell immediately and at all costs but rather to sell within a reasonable time. Their task was to salvage as much of the investment for the estate as was possible. Rules governing investments " must yield to the rule of necessity or safety." (*Costello* v. *Costello,* 209 N. Y. 252, 261.) The obligation to dispose of the securities carried with it discretion to determine what constituted the first favorable opportunity for a sale. (*Matter of Westerfield, supra,* p. 157.)

The general rule has been stated thus: " The trustee is not liable for failing to sell until he can make a sale at a fair value for the property. * * * [In] times of panic when prices of securities fall below what he reasonably regards as their fair value owing to forced selling, he is not under a duty to sell even securities which are listed on a stock exchange and have a ready· market. On the other hand, he is subject to liability if without exercising a reasonable amount of prudence he sells at an unnecessary sacrifice. * * * He is justified in taking time to get out of a difficult situation which has arisen without his fault, even though he would not be justified in deliberately getting into the situation." In determining the appropriate time for sale, the trustee may consider " the amount which the trustee would receive on an immediate sale as compared with what he reasonably regards as its intrinsic value; * * * the general state of the market, as for example whether the prevailing prices are generally considered unduly low as in the case of a general depression or are considered unduly high." (Restatement, Trusts, § 231, Comment [c].)

" Decision to sell in a declining market is perhaps the most difficult decision to make in the administration of trusts. * * * The court cannot close its eyes to the fact that during the period of the depression optimistic predictions of a recovery of security values was common in the market." (*Matter of Feinberg,* 82 N. Y. S. 2d 879, 883, DELEHANTY, S., affd. 275 App. Div. 925.) The trustees are to be judged in the light of circumstances which existed at that time.

The evidence requires the finding that the trustees used vigilance, diligence and prudence in the retention and sale of the securities and that they did not delay unreasonably in disposing of them, and the court so finds. Had the trustees sold more promptly, or perhaps, held even longer, the trust estate would have lost less. Their decisions, however, were made on the basis of information which they were then able to assemble. They acted with the intention of benefiting only the trust estate. For errors of judgment, if any, or lack of prevision and prophecy, they are not liable. (*Matter of Clark*, 257 N. Y. 132, 140.) The objections of the special guardian are, therefore, overruled.

The reasonable compensation of the attorneys for petitioners is fixed in the amount requested.

Submit decree on notice settling the account accordingly.